LIST OF EXHIBITS

A. CINTAS MASTER PURCHASE AGREEMENT
B. SGS TEST REPORT
C. EMAIL RE PHOTOS AND PHOTOS
D. PPE AID SPEC SHEET
E. PPE AID EXAM GRADE
F. PPE SPEC SHEET
G. TESTING DURABLE NITRILE
H. INOV8 SETTLEMENT AGREEMENT

# EXHIBIT 'A'

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

# CINTAS PURCHASE AGREEMENT
## MPA#

| SELLER: Bur-Tex Hosiery, Inc. | BUYER: | Cintas Corporation No. 2 |
|---|---|---|
| ADDRESS: 521 Paul Benefield Ln | ADDRESS: | 6800 Cintas Blvd. |
| Fyffe, AL 35971 | | Cincinnati, OH  45262-5737 |
| ACCT. MGR: Colton Childress | CONTRACT ADMIN: | Tom Stiver |
| TEL. NO: 256-623-2637 | TEL. NO: | 513-972-4277 |
| FAX NO: 256-623-2638 | FAX NO: | |
| EMAIL: coltonchildress09@gmail.com | EMAIL: | stivert@cintas.com |
| WEBSITE: | WEBSITE: | www.cintas-corp.com |

## MASTER PURCHASE AGREEMENT

**ITEMS/SERVICES COVERED: Disposable gloves, sanitizing products and other personal protective equipment.**

INTENT: This Agreement covers purchases made by Cintas business units located in the United States and Canada (if applicable).

THIS MASTER PURCHASE AGREEMENT is made and entered into this 30th day of October 2020 ("Effective Date"), by and between Cintas Corporation, a corporation having its principal office at 6800 Cintas Blvd. Mason, Ohio 45040 (together with its affiliates, "Buyer") and **Bur-Tex Hosiery, Inc.** with offices located at 521 Paul Benefield Ln., Fyffe, AL 35971 (together with its affiliates, "Seller").

1. **Basic Agreement.** This Master Purchase Agreement, along with any exhibits, schedules or any other documentation mutually agreed upon between the parties and incorporated herein by reference, (collectively hereinafter referred to as the "Agreement") sets forth the terms and conditions which shall govern the supply of Products and/or Services during the Term of this Agreement. The Products and/or Services are defined in **Exhibit A** Products and Pricing, **Exhibit E** Product Specifications.

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

**2.     Term.** This Agreement shall continue in effect for **two** (2) year(s) from the Effective Date set forth above unless earlier terminated in accordance with cancellation clauses contained herein (the "Term") This Agreement shall expire on November 13, 2022.

**3.     Purchase of Products and/or Services.** From time-to-time during the term of this Agreement, Buyer may purchase the services and associated deliverables and/or products as set forth on the attached **Exhibit A** and incorporated herein by this reference ("Products and/or Services") by issuing to Seller a purchase order for such Products and/or Services ("Purchase Order") or by such other means as may be described in **Exhibit A**.  **Exhibit A** may be modified from time-to-time to include additional Products and/or Services or delete existing Products and/or Services; provided, however, that all such modifications to the Exhibit must be in writing and mutually agreed upon between both parties.

**4.     Purchase Orders.** Purchase Orders shall be placed with Seller on Buyer's standard purchase order form (or such other form as the parties may mutually agree upon such as EDI or web based systems, see section on E-Commerce), specifying the Products and/or Services, quantities thereof ordered, the specifications therefor, the delivery date(s) and delivery location(s) and such other terms and conditions of purchase as noted on the Purchase Order. Delivery dates in the Purchase Order shall be consistent with commercially reasonable lead times, except as the parties may otherwise mutually agree.  Seller shall provide Buyer with a prompt acknowledgment orally (or in writing, if so requested by Buyer) of the Purchase Order.  Commencement of performance pursuant to a Purchase Order shall constitute acceptance of such Purchase Order by Seller without reservation.  Buyer shall not be bound by the terms of any confirmation form, acceptance, invoice, bill of lading or other document that purports to vary any of the terms and conditions of this Agreement or any Purchase Order.  Orders for Products and/ or Services may be submitted to Seller orally, provided that an order made orally shall be confirmed by a written Purchase Order (bearing the additional words "confirmation of oral order") submitted to the Seller within [five (5)] business days of the date on which Buyer gave the oral order.  The Seller shall maintain the labor, materials and facilities necessary to produce and deliver to the Buyer all Products and/or Services required under complying Purchase Orders.  Please see **Exhibit A** for any other order requirement details.

**5.     Price.** Pricing for Products and Services shall be as set forth in **Exhibit A** and shall remain in effect and unchanged during the Term of the contract, unless modified in accordance with this Agreement. Any decrease in costs for materials and labor will immediately be applied to Buyer's price. The Price list set forth in **Exhibit A** may be modified by Seller annually, upon thirty (30) days' prior written notice to Buyer.  Proposed price increases during the Term shall be reviewed by the parties and any changes to that pricing must be mutually agreed upon by amendment to the affected **Exhibit A**.

**6.     Non-Exclusivity; Future Business.** It is understood that Buyer does not agree to use Seller exclusively and that Buyer may enter into contracts with and purchase similar services

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

and products from other vendors while under contract with Seller. Buyer shall only be obligated to purchase products from Seller under a specific Purchase Order.  Buyer has no obligation to place future orders with Seller and is not obligated to continue to do business with Seller by oral agreement, course of dealing, concepts of contracts of indefinite duration and business expectancy or otherwise.

**7.**    **Taxes.**  Buyer shall pay any applicable Federal, state, provincial, and local sales and use taxes associated with its purchase of Products and Services.  Buyer shall have no liability for any taxes based on Seller's net income, taxes measured by any payments to Seller's employees or any employee contributions, or any franchise taxes owed or owing by Seller.  Seller may pay applicable taxes on Buyer's behalf and include any taxes paid by seller on Buyer's behalf on invoice for goods to Buyer.

**8.**    **Invoicing and Payment.**  Seller's invoices shall include all legally established requirements, as applicable, and shall specify the relevant Purchase Order number and, if applicable, CEA/IO number being invoiced.  Any invoices submitted without this information will not be processed for payment and will be returned to the Seller. Invoices may be submitted manually or electronically.  The preferred method is electronically (See E-Commerce Clause). Seller shall not invoice, or date invoices, prior to the date goods were shipped or services provided.

Notwithstanding any terms or provisions to the contrary on Seller's invoice, payment for Products and Services shall be issued DUE TERMS from the invoice date, receipt of goods or services and receipt of valid invoice.

Buyer shall be entitled to offset against any of Seller's invoices undisputed amounts owing by Seller or any of Seller's affiliates to Buyer or any of Buyer's affiliates under this Agreement or any other agreement between the Parties and/or their respective affiliates.  Payment on Seller's invoices shall be made in U.S. dollars unless the parties expressly agree otherwise.

**9.**    **E-Commerce.**  Intentionally left blank, Cintas First Aid Division isn't using EDI at the moment but are preparing for it in the future.

**10.**    **Methods of Payment.** Payments will be generated manually or electronically; the preferred method is electronically via Visa Purchasing Card or ACH/EDI.

**11.**    **Inspection and Rejection.** Payment for the products and/or services delivered hereunder shall not constitute acceptance thereof.  Buyer shall have the right to inspect such products and to reject any or all of said products which are, in the Buyer's sole judgment, defective or nonconforming with the product specifications outlined in this Agreement, including without limitation, the specifications set forth in **Exhibit E**.  In such event, Buyer shall notify Seller, and upon Seller's receipt of such notification, Seller shall promptly correct or replace any defective or

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

non-conforming Products or Services and the cost of such correction or replacement, including shipment, return and other administrative costs, shall be borne by Seller. In no event shall Seller have more than ten (10) calendar days from receipt of Buyer's notice of the nonconformity to cure such nonconformity or to replace the nonconforming Product or Service. Products rejected and products supplied in excess of quantities called for in the applicable Purchase Order may be returned to Seller at Seller's expense and, in addition to Buyer's other rights, Buyer may charge Seller all expenses of unpacking, examining, repacking, and reshipping such products. In the event Buyer receives Products or Services whose defects or nonconformity is not apparent on examination, Buyer reserves the right to require replacement or repair, as well as setoff or payment of damages incurred by Buyer as a result of such defects or other nonconformance. Nothing contained in this Agreement or related Purchase Orders shall relieve in any way the Seller from the obligation of testing, inspecting and quality control. Additional specifications and instructions related to inspection and rejection may be included in **Exhibit E.**

**12.** **Delivery and Shipment.** When Cintas is responsible for shipping charges, Delivery and Shipment terms for Products and/or Services shall be the most optimal methods as reasonably determined by Buyer's Transportation Department. In the event of any delay during delivery, Seller shall be responsible for all costs associated with such delay, including the costs of temporary storage, unloading, loading and rearranging of Products. Deliveries are to be made both in quantities and at times specified herein or on related Purchase Order. TIME IS OF THE ESSENCE FOR THIS AGREEMENT. If in order to comply with Buyer's required delivery schedule it becomes necessary to use an expedited shipping method, any increased transportation or other related costs incurred shall be paid at Seller's cost and expense, unless the necessity for such rerouting or expedited handling has been caused by Buyer. In which case, the most cost effective method of shipment will be determined by the parties. Buyer shall retain all other rights or remedies.

Buyer may in accordance with the terms of this Agreement, cancel all or part of any related Purchase Order in the event Seller fails to deliver products and/or services as scheduled herein or on the Purchase Order and such failure is not cured by Seller within thirty (30) days of its occurrence.

Freight Terms: FOB, Cintas First Aid and Safety, designated place in Ohio or Nevada, DDP

**13.** **Changes.** Buyer may, at any time by issuing a written notice to the Seller, request changes to open Purchase Orders and changes and variations to the Products and/or Services. Such changes and variations may be requested with respect to the following: (i) drawings, designs, specifications, where the supplies to be furnished are to be specially manufactured for Buyer in accordance therewith; (ii) method of shipment or packing; (iii) place of delivery; (iv) the shipment/delivery schedule; (v) the quantity of Products to be delivered; (vi) the period performance of Services, and (vii) such other particulars which Buyer may reasonably request. Seller agrees to use its best efforts to accommodate Buyer's request and to mitigate any additional

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

cost or expense that may be associated with making the changes or variations requested. To the extent that such changes or variations will cause Seller to incur additional costs or expense, Seller shall promptly notify Buyer of the same and the parties shall confer in good faith to negotiate an equitable adjustment to the pricing.

**14.    Product and Process Changes.** Seller will make no changes to the design, materials, components, specifications or manufacturing location, or processes specified in this Agreement or Purchase Order or documents referenced therein, or if none, those in place at time of issuance of this Agreement or Purchase Order, without 90 days advance written notice to and approval of Buyer (which shall not be unreasonably withheld). This requirement applies whether or not there is a cost impact associated with the change and regardless of the type of change, including product improvements.

**15.    Information and Instructions.** Seller agrees to furnish to Buyer all warnings, information, documents, labels, placards, containers and other materials which may be required by applicable federal, state, provincial, or local law, statutes, ordinances, treaties, judgments, consents, approvals, permits, guidance documents, guidelines, orders, rules or regulations of any governmental, regulatory or public authority related to the use, packaging, receiving, storing, handling, shipping or transporting of Products, together with detailed written instructions as to their use and disposition of the Products, all of which to be furnished at and current as of the time of delivery. Such instructions must be furnished in both English and French.

**16.    Reporting Duty.**

**a)** Buyer may request reporting from time-to-time and such reporting will be as mutually agreed upon between the parties at such time. The reports must be sent to the Contract Administrator noted in Header of this Agreement.

**b)** Seller shall promptly provide written notice to Buyer of any of the following events or occurrences, or any facts or circumstances reasonably likely to give rise to any of the following events or occurrences: (a) any failure for any reason by Seller to perform any of its obligations under this Agreement; (b) any delay in delivery of Products; (c) any defects or quality problems relating to Products; (d) any legal or regulatory investigation conducted by a governmental or regulatory body related to the Product; and (e) any failure by Seller, or its subcontractors or common carriers, to comply with any applicable law or regulation.

**17.    Seller's Representations and Warranties.**

**a)** Seller expressly warrants that (i) it will convey good title to the Products supplied hereunder, free of all liens and encumbrances; (ii) the Products shall be new and free from any defects in materials or workmanship and shall be delivered to Buyer in conformity with any applicable specifications, warranties, statements made on the containers, products, and

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

labels, including, without limitation, manufacturer warranties, Seller's advertised specifications, Seller's statements made to Buyer, and all specifications agreed upon between Buyer and Seller; (iii) the Products supplied hereunder shall be of merchantable quality, fit for their intended use and/or purpose; and (iv) the Products and Services will not infringe any third party's intellectual property or other proprietary right.

b)      Seller further warrants that the Products and Services have been manufactured, stored, performed, packaged, and labeled (as applicable) in compliance with all applicable federal, state, provincial, or local laws or statutes as well as all regulations, rulings, orders and standards promulgated thereunder, including without limitation the Federal Hazardous Materials Transportation Law, 49 U.S.C. §5101, et seq., the *Federal Food, Drug, and Cosmetic Act* (FD&C Act), United States Code Section 21, the *Food and Drugs Act*, R.S.C. 1985, c F-27 and all regulations therein including the *Medical Device Regulations*, SOR/98-282, and the *Textile Labelling Act* (R.S.C., 1985, c T-10).

c)      Seller represents and warrants that it possesses the experience, skill and knowledge necessary to perform the Services to be provided hereunder and that it currently employs and will continue to employ the requisite staff necessary to perform its obligations to Buyer. Seller further warrants that it will perform any Services hereunder in a good, workmanlike, and professional manner and in accordance with the highest prevailing industry standards and practices, and in a manner protective of the employees of Seller, the employees of Buyer, and the public.

d)      Seller further warrants that all products or services furnished hereunder will be merchantable and will be safe and appropriate for the purpose for which products or services of that kind are normally used. The manufacture and sale of the products and performance of all services will not (i) violate any United States, Canada,  or foreign federal, state, provincial, municipal or other statute, law, regulation or ordinance, and (ii) infringe any patent, trademark, trade name, trade secret or other intellectual property or proprietary rights of any person or entity, and (iii) Seller has delivered all applicable notices and warnings as to hazardous materials, material safety data sheets and all other necessary regulatory or required notices for the Products and Services, as applicable. Seller hereby acknowledges the particular purpose for which Buyer intends to use the products or services.  As such, Seller warrants that all products or services furnished will conform in all respects to any sample, inspection, specification, test, acceptance or use of the products or services furnished hereunder shall not affect the Seller's obligation under this warranty, and such warranties shall survive inspection, test, acceptance and use.  Seller's warranties herein shall run to Buyer, its successors, assigns, and customers, and users of products sold by Buyer and all affected customers of Buyer.  Seller agrees to replace or correct defects of any products or services not conforming to the foregoing warranty promptly, without expense to Buyer, when notified of such nonconformity by Buyer, provided the Buyer elects to provide Seller with the opportunity to do so. In the event of failure of Seller to correct defects in or replace nonconforming products or services promptly, Buyer, after reasonable notice to Seller,

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

may make such corrections or replace such products and services and charge Seller for the cost incurred by Buyer in doing so.

In addition to the above, Seller will provide any additional warranties set forth on **Exhibit E**. The provisions of this Section 17 shall survive the termination or expiration of this Agreement or the termination or expiration of any attachments, exhibits, addenda or statements of work thereunder.

18.   **Price Warranty.** Seller warrants that the prices charged for the Products or Services delivered under this Agreement are the lowest prices charged by Seller to any of its external customers for similar volumes of similar Products or Services.  If Seller charges any external customer a lower price for a similar volume of similar Products or Services, Seller must notify Cintas and apply that price to all Products or Services ordered under this Agreement.  If at any time prior to full performance of this Agreement Cintas notifies Seller in writing that Cintas has received a written offer from another supplier for Products or Services similar to those to be provided under this Agreement at a price lower than the price set forth in this Agreement, Seller is obligated to immediately meet the lower price for any undelivered Products or Services.  If Seller fails to meet the lower price Cintas, at its option, may terminate the balance of the Products or Services to be delivered under this Agreement without liability.

19.   **Seller Financials.** All new suppliers to Cintas regardless of spend and all existing suppliers that provide over $10,000,000 per year in equipment, products and services or are a sole source provider of a critical product will be required to send financial information on an annual basis in order to ensure the financial stability of the Seller and continuity of supply to Cintas.

Financial information to include the Seller's audited annual profit/loss statement, a statement of cash flows and fiscal year-end balance sheets from last three fiscal years and a current year-to-date profit/loss statement and most recent balance sheet.

20.   **Termination for Cause by Buyer.** Buyer may terminate this Agreement or any Purchase Order for cause in the event of any default by the Seller, or if the Seller fails to comply with any of the terms and conditions of this Agreement or related Purchase Order. Late deliveries, deliveries of Products and/or Services which are defective or which do not conform to the terms hereof, and failure to provide Buyer, upon request of reasonable assurances of future performance, shall all be causes allowing Buyer to terminate this Agreement or any Purchase Order for cause.  In the event of termination for cause, Buyer shall not be liable to Seller for any amount, and Seller shall be liable to Buyer for any and all damages sustained by reason of the default which gave rise to the termination.

21.   **Termination for Convenience by Buyer.**  Buyer reserves the right to terminate this order or any part hereof for its sole convenience.  In the event of such termination, Seller shall immediately stop all work hereunder and shall immediately cause any of its suppliers or subcontractors to cease such work.  Seller shall be paid a reasonable termination charge mutually

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

agreed upon by both parties. Seller shall not be paid for any work done after receipt of the notice of termination or for any costs incurred by Seller's suppliers or subcontractors which Seller could reasonably have avoided.

**22.   Bankruptcy.** In the event any bankruptcy, receivership or insolvency proceedings, voluntary or involuntary, are instituted by or against a party, the other party may, at its option cancel this Agreement or any open Purchase Order hereunder to the extent permitted by law or court order.

**23.   Indemnification.**

**a)**   General Indemnification. Seller shall indemnify, defend and hold Buyer, its officers, directors, employees, representatives, and agents, harmless from any and all costs, losses, expense, damages, claims, suits, or liability whatsoever ("Claim"), including attorney's fees and costs of investigation and settlement, arising out of or resulting from any of the following (i) the incorrectness or breach of any representation or breach of any warranty by Seller contained in this Agreement (including without limitation the representations and warranties contained in Section 17) or in any certificate or other document delivered by Seller pursuant hereto; (ii) a breach by Seller of any of its covenants or agreements contained in this Agreement, or any documents referenced in the Agreement; (iii) any failure to comply with any and all applicable laws, statutes, orders, permits, rules or regulations, including without limitation, failure to comply with Section 30; (iv) any bodily injury, the death of any person, or damage to real or tangible personal property caused by the negligent acts or omissions of Seller; (v) any negligent or more culpable act or omission of Seller (including any recklessness or willful misconduct) in connection with Seller's performance under this Agreement; or (vi) any Claim, legal or regulatory proceeding, investigation, or action with respect to any Products or Services, including but not limited to Claims of third parties based upon or arising out of Seller's performance of the Services, Seller's ownership, management, disposition or sale of the Products or Services, or any product liability claim, product recall or other reasonable action Buyer takes regarding any consumer and/or public safety resulting from the Products, whether any such Claims under Sections (i), (ii) or (iii) above arise under contract, tort, negligence, strict liability, product liability, or any other theory of law or legal basis.

**b)**   Intellectual Property Indemnification. Seller shall indemnify, defend, and hold Buyer harmless from any claim, damage, expense or liability for infringement of any patent, trademark, copyright or any other intellectual property or other proprietary rights arising out of the manufacture or sale of any of the Products and/or Services, and hold Buyer harmless in respect of any such infringement or of any damages, direct or indirect, arising thereof, provided that Buyer shall promptly notify Seller of any such claim and give Seller the opportunity to defend against such claim. With respect to any claimed infringement, Seller shall have the right to: (i) assume the defense or settle the claim at its discretion, (ii) modify the applicable Product and/or Service

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

so as to make it non-infringing, or (iii) take such other action as it deems reasonably necessary or appropriate in respect of the claim.

**24.    Limitation on Buyer's Liability; Statute of Limitations.**  IN NO EVENT WILL BUYER BE LIABLE TO SELLER FOR LOST PROFITS, SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR INDIRECT DAMAGES, HOWEVER CAUSED AND WHETHER ARISING IN AN ACTION OF CONTRACT, TORT OR OTHER LEGAL THEORY, EVEN IF IT WAS OR SHOULD HAVE BEEN AWARE OR ADVISED OF THE POSSIBILITY THEREOF, ARISING OUT OF THIS AGREEMENT. Buyer's liability on any claim of any kind for loss or damage arising out of or in connection with resulting from this Agreement or any Purchase Order or from the performance or breach hereof or thereof shall in no case exceed the price allocable to the products or services of unit thereof which gives rise to the claim.  Any action resulting from any breach on the part of the Buyer as to the products or services delivered hereunder must be commenced within one year after the cause of action has accrued.

**25.    Insurance.**  Upon execution of this Agreement, and prior to the Seller providing any products or services, the Seller shall provide a Certificate of Insurance showing that the Seller carries the minimum insurance requirements below.  (The required limits will be based on the goods and services provided).

| | |
|---|---|
| COMMERCIAL GENERAL LIABILITY | $1,000,000/Occurrence |
| Contractual Liability | $1,000,000/Occurrence |
| Personal & Advertising Injury | $1,000,000/Occurrence |
| General Aggregate | $2,000,000 |
| Products/Completed Operations | $2,000,000/Aggregate |

Such insurance shall cover liability arising from premises, operations, independent contractors, products-completed operations, personal and advertising injury, and liability assumed under an insured contract (including the tort liability of another assumed in a business contract).  There shall be no endorsement or modification of the Commercial General Liability form to exclude coverage for claims arising from, explosion, collapse, underground property damage or work performed by the Seller.

| | |
|---|---|
| AUTOMOBILE LIABILITY | |
| Any Auto | $1,000,000/Combined Single Limit |
| EXCESS/UMBRELLA LIABILITY | $2,000,000/Occurrence/Aggregate |
| WORKERS COMPENSATION | Statutory limits for state in which work will be performed |
| EMPLOYERS LIABILITY | $500,000 each accident<br>$500,000 disease – each employee<br>$500,000 disease – policy limit |

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

PROFESSIONAL LIABILITY                    Limit determined on good/services provided
*(only required when providing professional service)*

ENVIRONMENTAL LIABILITY         $1,000,000 / $2,000,000
*(required when providing environmental related services such as disposal)*

OTHER COVERAGE                           As may be required for specific goods/services

Seller shall, at its own expense, carry and maintain at all times, the insurance coverages and limits outlined above.  In addition, Seller's insurance shall (1) name Cintas Corporation, its subsidiaries, affiliates, co-lessees or co-ventures, agents, directors, officers, and employees as Additional Insured on the General Liability, Automobile Liability and the Umbrella/Excess policies. (Additional Insured Endorsements CG 20 10 and CG 20 37 is required), (2) be primary and non-contributory, (3) include a waiver of subrogation in favor of Cintas Corporation, its subsidiaries, affiliates co-lessees or co-ventures, agents, directors, officers, and employees, and (4) provide that the insurer must give CINTAS CORPORATION at least 30 days' prior written notice of cancellation, non-renewal or material modification of any insurance policy. The required liability insurance may be arranged under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an Excess or Umbrella Liability policy.

Not less than two weeks prior to the expiration of the applicable policy, the Seller shall supply CINTAS CORPORATION with a new or replacement Certificate of Insurance and Additional Insured endorsement as proof of renewal.   The replacement/renewal Certificate and Endorsements shall be similarly endorsed in favor of CINTAS CORPORATION and Indemnified Parties as set forth above.  All coverage shall be placed with an insurance company duly admitted in the State where the products or goods are being provided and shall be reasonably acceptable to CINTAS CORPORATION.  All Sellers insurance carriers must maintain an A.M. Best rating of "A –" or better and coverage shall be afforded to the Additional Insureds whether or not a claim is in litigation.

**26.    Compliance with Good Ethical Practices.**  Seller represents, warrants and covenants to Buyer, as of the date hereof and as of the date of each shipment of Products or performance of Service to Buyer, that in carrying out its responsibilities hereunder, neither Seller, nor any of its equity holders, affiliates, beneficial owners, partners, officers, directors, employees or agents, shall, directly or indirectly, offer, pay, promise to pay, or authorize the payment of any money, or offer, give, promise to give, or authorize the giving of anything of value to (a) any official or employee of any government, or any department, agency, or instrumentality thereof in the United States or any foreign country, (b) any political party or official thereof, or to any candidate for foreign political office in the United Stated or any foreign country, or (c) any official or employee of any public international organization, in each case for the purpose of influencing any act or decision of such official, employee, party or candidate or inducing such official, employee, party or candidate to do or omit to do any act in violation of the lawful duty of such official, employee, party or candidate, or securing any improper advantage for Buyer or otherwise promoting the business interests of Buyer in any respect.

Notwithstanding anything to the contrary in this Agreement, Buyer may, in addition to its other remedies, immediately terminate this Agreement in the event Buyer should receive information which it determines, in its sole discretion, to be evidence of a breach by Seller of any representation, warranty, covenant or undertaking set forth in this Section.  In the event of such termination, Buyer shall have no liability to Seller for any fees, reimbursements or other compensation under this Agreement, except for Products and/or Services which have been delivered to Buyer prior to termination and have not been returned to Seller by Buyer, and Seller shall defend and indemnify Buyer for any third-party loss, cost, claim, or damage resulting from the breach of this Section, and Buyer's termination of this Agreement.  Cintas may verify that the seller is in compliance with these regulations per the Cintas FCPA C208 policy.

27.    **Assignment.** The parties may not assign or subcontract its rights or obligations under the Agreement without the prior written consent of the other party which shall not be unreasonably withheld. Provided, however, Buyer may assign the Agreement to another entity without consent of Seller, upon written notice to Seller, in the event of a merger or consolidation involving Buyer (or a division or affiliate/subsidiary of Buyer) or the transfer of all or substantially all of the assets of Buyer (or a division or affiliate/subsidiary of Buyer) or to an entity controlling, controlled by or under the common control with Buyer.

28.    **Payment Setoff.** Notwithstanding anything to the contrary in this Agreement, and without prejudice to any other right or remedy it has or may have, Buyer may, without notice to Seller, deduct, set off, or recoup any liability it owes to Seller against any liability for which Buyer determines Seller is liable to Buyer.

29.    **Safety on Buyer's Premises.** To the extent that Seller's agents, employees or subcontractors enter upon premises occupied by or under the control of Buyer, or any of its customers, or suppliers, in the course of the performance under this Agreement, Seller shall take all necessary precautions to prevent the occurrence of any injury (including death) to any persons, or of any damage to any property.

30.    **Compliance with Laws.** Seller agrees to comply with all of its legal and regulatory obligations applicable to the performance of this Agreement and its design, manufacture, packaging, labeling and sale of the Products, including (without limitation) all applicable Federal, State, Foreign, Provincial, Municipal or Local Laws, Rules, Regulations or Ordinances, including (without limitation) any regulations imposed by the U.S. Food and Drug Administration.

Seller agrees that it is – and shall register and act as – the manufacturer of record for all Products with respect to all governmental and regulatory authorities (including, without limitation, the U.S. Food and Drug Administration) and shall fully comply with all requirements imposed by such regulatory authorities, including (without limitation) requirements related to the design, manufacture, production, reporting, and labeling of any Products.

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

Seller shall indemnify and hold Buyer harmless and defend Buyer from any liability resulting from failure of such compliance, including but not limited to any recalls, market withdrawals, or safety notices pursuant to applicable U.S. Food and Drug Administration regulations and the *Food and Drugs Act*, R.S.C. 1985, c F-27 and all regulations therein.

**31.    Confidentiality.** Unless covered under a separate agreement (whether signed before or contemporaneously with this Agreement) between the parties, in which case such separate agreement will control and this provision shall be null and void, "Confidential Information" shall mean any information, technical data or know-how, including without limitation, any research, products, services, developments, inventions, processes, techniques, designs, distribution, engineering, marketing, financial, merchandising and/or sales information, which is disclosed by one party to the other party orally, in writing, by demonstration, or other media during discussions of the Proposed Participation , as well as any information obtained by observation or otherwise during visits to a Cintas field operation.  Each party shall bind to its confidentiality obligations hereunder all of its respective employees, officers, advisors, consultants, members, and agents who may come into contact with or obtain access to the Confidential Information during the term of this Agreement.

Seller shall not advertise or publish the fact that Buyer has contracted to purchase Products and/or Services from Seller, nor shall any information related to this Agreement be disclosed without Buyer's written permission.  The nondisclosure covenant in this Section has no geographic or territorial limitation and survives the termination or expiration of this Agreement.

**32.    Independent Contractor.**  For all purposes of this Agreement, and notwithstanding any provision of this Agreement to the contrary, Seller is an independent contractor and is not an employee, partner, joint venture, or agent of Buyer. Seller shall make no representation that Seller is an employee of Buyer.

**33.    Modification and Waiver.**  This instrument constitutes the entire understanding between the parties. No sales acknowledgment form, invoice, shipping papers or other written document shall be construed as altering or overriding the terms and conditions herein.  No amendment, alteration, modification or waiver of this Agreement subsequent to the date hereof shall be valid or enforceable unless in writing and signed by both parties, and no prior or current course of dealing between the parties, any usage of trade or custom of the industry, or printed form of the Seller, such as a billing invoice, bill of lading or packing list, shall modify or supplement the terms and conditions of this Agreement.

**34.    Waiver.** Buyer's failure to insist on performance of any of the terms or conditions herein or to exercise any right or privilege or Buyer's waiver of any breach hereunder shall not thereafter waive any other terms, conditions, or privileges, whether of the same or similar type

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

**35.   Notices.** Any notice given pursuant to this Agreement shall be in writing and sent by certified mail postage prepaid, return receipt requested, to the appropriate party at the address set forth at the beginning of this Agreement or at such other address as such party may provide in writing to the other party.  Any such notice shall be effective upon the receipt thereof.

**36.   Governing Law/Venue.** This Agreement and each Purchase Order issued hereunder shall be governed by, interpreted and enforced in accordance with the laws of the State of Ohio, without reference to conflict of laws principles, and the United Nations Convention for the International Sale of Goods shall not be applicable.  The parties hereto agree (i) that any suit, action, or proceeding brought to enforce any provision of this Agreement shall be instituted exclusively in the courts of the State of Ohio located in Hamilton County, Ohio or the United States District Court for the Southern District of Ohio, and (ii) irrevocably and unconditionally submit and consent to the exclusive jurisdiction and venue of any such court for such purpose.  Judgment upon any award made by such courts may be entered in any court having jurisdiction thereof, if necessary.

**37.   Settlement of Disputes.**

a) The Buyer and Seller agree to work together to resolve any disputes arising out of or related to this Agreement, including the breach thereof, which may arise between them in a timely, professional and non-adversarial manner.

b) If during the course of performance an issue arises which project personnel of the Buyer and Seller are unable to resolve, the parties agree that the issue shall be submitted to the designated higher level managers within the organizations of the Buyer and Seller for good faith discussion and negotiation.  The designated higher level manager for each of the parties shall be identified promptly following execution of any work in connection with this Agreement, and shall have authority to settle disputes.  The designated higher level managers shall use their best efforts to negotiate in good faith to find a mutually acceptable resolution to the issues that are brought to their attention.

c) In the event that the designated higher level managers are unable to negotiate a resolution of such an issue, the matter shall be submitted for mediation in accordance with the rules of the International Chamber of Commerce.

d) If dispute cannot be resolved under the procedures outlined above, the parties may mutually agree that it shall be submitted for final decision by binding arbitration in accordance with the rules of the International Chamber of Commerce.

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

   **e)** Such mediation and arbitration, if any, shall be conducted in a mutually agreed location under the rules of the International Chamber of Commerce, and shall be held in the English language.

   **f)** In no event may a demand for arbitration be made after the date on which institution of legal or equitable proceedings based upon the dispute would be barred under the applicable statute of limitations. The arbitrators shall provide a written decision within twelve months after the proceedings have been initiated acting strictly in accordance with and applying the law specified under Section **Governing Law/Venue** of this Agreement. No arbitration arising out of or relating to this Agreement may include by joinder, consolidation or in any manner any person or entity who is not a party to this Agreement.

   **g)** Any award rendered by the arbitrator(s) will be final, and judgment may be entered upon it in any court of competent jurisdiction.

     **38.** **Severability.** If any provision of the Agreement, or the application of any such provision to any person or in any circumstance is held invalid, the application of such provision to any other person or in any other circumstance, and the remainder of the Agreement, shall not be affected thereby and shall remain in full force and effect.

     If any provision of this Agreement or related purchase order is determined by competent authority to be prohibited or unenforceable, such provision shall be ineffective only to the extent of such prohibition or invalidity and unenforceable only in the jurisdiction of such authority without invalidating the remainder thereof or any of the remaining provisions of this Agreement or purchase order.

     **39.** **Force Majeure.** It shall not be deemed a default hereunder and neither Buyer nor Seller shall be liable for a failure to perform hereunder arising from causes or events beyond reasonable control and without the fault or negligence of Buyer or Seller including, but not limited to, labor disputes of any kind, acts of God, floods, fires, explosions or storms, transportation difficulties, war, any rule or action of any court, instrumentality or agency of federal or state or provincial or local government ("Force Majeure"). To the extent that, and so long as the obligations of either party are affected by any such cause or event, such obligation shall be suspended; provided, however, that time is of the essence for this Agreement, and should Seller as a result of a Force Majeure fail to comply with Buyer's delivery schedule or otherwise fail to comply with its obligations hereunder, Buyer may terminate this Agreement or any Purchase Order placed hereunder in whole or in part without liability.

     **40.** **Binding Effect.** All rights conferred by this Agreement shall be binding upon, inure to the benefit of, and be enforceable by or against the respective successors and assigns of the parties hereto.

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

**41.    Headings.** The headings in this Agreement are inserted for convenience only and shall not affect the construction hereof.

**42.    Entire Agreement.** This Agreement constitutes the entire agreement between the parties and there are no verbal or collateral understandings, agreements, representations other than as expressly set forth therein.  This Agreement supersedes all prior agreements, (except FCPA C208 and Social Compliance C49), sales proposal, negotiations and other representations or communications, whether oral or written.  If there is any conflict between the terms and conditions of Buyer's Purchase Order (or any other purchase or sales document) and the terms and conditions of this Agreement, this Agreement shall control.  This Agreement may be added to, modified, replaced or rescinded only in writing and signed by a duly authorized representative of each party.

**43.    Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument, provided that all such counterparts, in the aggregate, shall contain the signatures of all parties hereto. Facsimile and other copies shall have the same force and effect as the original.

**44.    EEO Statement. Cintas is an equal opportunity employer and federal contractor or subcontractor. Consequently, the parties agree that, as applicable, they will abide by the requirements of 41 CFR 60-1.4(a), 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a) and that these laws are incorporated herein by reference.  These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity, or national origin.  These regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, or national origin, protected veteran status or disability.  The parties also agree that, as applicable, they will abide by the requirements of Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of employee rights under federal labor laws.**

**45.    Use of Name.** Neither party shall use the name of the other party or its affiliated companies as a reference in any sales material presentation, or sales call, or in any of such party's customer lists, or in any publicity, news release, company biography, or advertisement, or in any other written material or any promotion or other activity, without the other party's prior written consent.

**46.    Publicity.** No advertising, sales promotion, press release and other publicity related to this Agreement or any Purchase Order or the Products/Services provided hereunder

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

wherein Buyer's name or mark is mentioned or language from which the connection of said name or mark therewith may be inferred or implied, shall be issued by Seller, its agent, consultant or representative without the prior written approval of Buyer. Any inquiry which Seller may receive from news media concerning the commercial relationship between Buyer and Seller shall be referred to Buyer's communications department for coordination prior to response.

**47.    Seller Diversity.**  As part of our overall business strategy, the Cintas Corporation is committed to mutually beneficial relationships with minority and women-owned businesses (MWBEs). Our mission is to expand and maximize the utilization of our network of certified women and minority suppliers who will enhance value and drive a competitive business advantage. As this is part of our business strategy we have an expectation that our suppliers share this strategy within their businesses.  Seller shall supply documentation showing their supplier diversity plans and details of any diversity programs currently in place.

**48.    Sustainability.**  Cintas is committed to improving the lives of our customers, partners and communities by integrating environmentally sustainable practices, principles and solutions across our business lines.  As part of our business strategy, Cintas has an expectation that our suppliers have a commitment and interest in the total environmental impact with a particular emphasis on the following sustainability objectives: increased recycled content, reduced transport distances, whole life cost considerations, reduced energy use and $CO_2$ emissions, reduced water consumption and waste reduction.  Seller should share their sustainability initiatives and successes particularly as they may relate to Cintas's business. Cintas reserves the right to request and receive data that may be used to calculate source reduction, recycled content, certification or carbon footprint related to the products/services we purchase.

Seller needs to confirm that their supply chain complies with all applicable international, national and local laws (including environmental, forestry and civil rights laws and treaties). Seller must identify any possible issues that may exist and outline initiatives to resolve them.

**49.    Conflict Minerals.**  In compliance with Dodd-Frank Act Section 1502 and rules promulgated by the Securities and Exchange Commission relative to "Conflict Minerals" (currently columbite-tantalite (coltan), cassiterite, wolframite, and gold, to include derivatives (tantalum, tin, and tungsten, which are known as the "3Ts") and which are used to finance conflict in the Democratic Republic of Congo or adjoining countries); SELLER agrees to:  1) disclose if any Conflict Minerals are necessary to the functionality or production of the product(s) delivered to Cintas under this contract or any order 2) identify whether such Conflict Minerals  originated in the "Covered Countries" (as defined by law) or came from recycled or scrap sources, or 3) identify whether such Conflict Minerals  originated in the Democratic Republic of Congo or adjoining countries. SELLER will include in the disclosure a description of the measures it took to exercise due diligence on the Conflict Minerals' source and chain of custody.

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

**50.    Document Order of Precedence.**   In the event of a conflict between this Agreement and any other documents that purport to govern the same matters set forth herein, this Agreement shall prevail.

The exhibit(s) checked (√) below are attached and form a constituent part of this agreement:

Exhibit A    √    Products and Pricing

Exhibit B    √    Confidentiality Agreement

Exhibit C    √    Code of Conduct

Exhibit D    √    Anti-Corruption Agreement (FCPA)

Exhibit E    √    Product Specifications

Exhibit F    √    Delivery Schedule

**BUYER:**                           **SELLER:**

Cintas Corporation                  Bur-Tex Hosiery, Inc.

By: _____        By: _Wayne Burgess_____

Name:  Steven Lohman               Name: Wayne Burgess

Title: Director, Sourcing          Title: Vice-President

Date: 11/14/2020                   Date: 11/14/2020

4817-1900-7432v2

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

**Exhibit A**

1. <u>Product.</u>
Buyer may purchase the following product from Seller:
   a. Product: Powder Free, Disposable, Nitrile Gloves. Sizes: Small, Medium, Large, Extra Large.
   b. Product: Powder Free, Disposable, Nitrile Examination Gloves. Sizes: Small, Medium, Large, Extra Large.
2. <u>Price.</u>
   a. Price per box (100) (S, M, L, XL) by air or sea: DDP to Cintas DC in Ohio or Nevada as agreed upon per an accepted purchase order.

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

**Exhibit E**







Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17





Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17









## 510(k) Premarket Notification

| | |
|---|---|
| Device Classification Name | Polymer Patient Examination Glove |
| 510(K) Number | K131440 |
| Device Name | POWDER FREE NITRILE PATIENT EXAMINATION GLOVES BLUE |
| Applicant | HEBEI HONGSEN PLASTICS TECHNOLOGY CO. LTD 5 CAREY STREET Pennington NJ 08534 |
| Applicant Contact | Charles Shen |
| Correspondent | HEBEI HONGSEN PLASTICS TECHNOLOGY CO. LTD 5 CAREY STREET Pennington NJ 08534 |
| Correspondent Contact | Charles Shen |
| Regulation Number | 880.6250 |
| Classification Product Code | LZA |
| Date Received | 05/20/2013 |
| Decision Date | 08/25/2013 |
| Decision | Substantially Equivalent (SESE) |
| Regulation Medical Specialty | General Hospital |
| 510k Review Panel | General Hospital |
| Summary | Summary |
| Type | Traditional |
| Reviewed By Third Party | No |
| Combination Product | Yes |

Page Last Updated: 10/26/2020
Note: If you need help accessing information in different file formats, see Instructions for Downloadi
Viewers and Players.
Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية |
Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English



U.S. Food and Drug Administration

Bur-Tex Hosiery, Inc. MPA#

Contract Effective Date 10/30/2020

Contract Template Rev Level 16 06/21/17

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 长度 (mm) | 247 | 242 | 245 | 243 | 249 | 245 | 247 | 242 | 249 | 246 | 245 | 243 | 248 |
| | 重量 (g/pcs) | 3.22 | 3.29 | 3.25 | 3.23 | 3.26 | 3.21 | 3.28 | 3.26 | 3.22 | 3.23 | 3.29 | 3.25 | 3.26 |
| | 掌宽(mm) | 86 | 86 | 86 | 86 | 86 | 85 | 86 | 86 | 86 | 86 | 86 | 86 | 86 |
| Wrist Thickness | 袖口厚度(mm) | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 |
| Palm Thickness S | 手掌厚度(mm) | 0.08 | 0.08 | 0.08 | 0.07 | 0.08 | 0.08 | 0.07 | 0.07 | 0.08 | 0.08 | 0.08 | 0.08 | 0.08 |
| Finger Thickness | 指尖厚度(mm) | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 |
| | 拉力强度(N) | 7.16 | 7.22 | 7.10 | 7.09 | 7.13 | 7.05 | 7.10 | 7.00 | 7.14 | 7.13 | 7.19 | 7.23 | 7.10 |
| | 伸长率 (%) | 511 | 512 | 512 | 509 | 518 | 520 | 515 | 524 | 517 | 503 | 516 | 512 | 510 |
| | 长度 (mm) | 244 | 249 | 243 | 245 | 248 | 247 | 245 | 242 | 249 | 243 | 248 | 245 | 249 |
| | 重量 (g/pcs) | 3.59 | 3.55 | 3.58 | 3.53 | 3.59 | 3.52 | 3.54 | 3.59 | 3.53 | 3.58 | 3.51 | 3.59 | 3.53 |
| | 掌宽(mm) | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 |
| Wrist Thickness | 袖口厚度(mm) | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 | 0.06 |
| Palm Thickness M | 手掌厚度(mm) | 0.08 | 0.07 | 0.07 | 0.08 | 0.08 | 0.08 | 0.08 | 0.08 | 0.08 | 0.08 | 0.08 | 0.07 | 0.08 |
| Finger Thickness | 指尖厚度(mm) | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 |
| | 拉力强度(N) | 7.05 | 7.22 | 7.02 | 7.16 | 7.29 | 7.08 | 7.00 | 7.16 | 7.13 | 7.28 | 7.10 | 7.15 | 7.09 |

# EXHIBIT 'B'

EXHIBIT 'B'



# Test Report

No.: QDHL1909015461OT          Date: SEP.25,2019          Page: 1 of 3

SHANDONG INTCO MEDICAL PRODUCTS CO., LTD

NO.9888, QIWANG ROAD, NAOSHAN INDUSTRY PARK, QINGZHOU, SHANDONG, CHINA

The following sample(s) was/were submitted and identified by the client as:

| | |
|---|---|
| Sample Description | : METRO/MAKRO PROFESSIONAL NITRILE GLOVES, NON-POWDERED, BLUE |
| Sample Receiving Date | : SEP.12,2019 |
| Testing Period | : SEP.12,2019 TO SEP.25,2019 |
| Test Performed | : SELECTED TEST(S) AS REQUESTED BY APPLICANT |
| Test Requested | : EN 455-2-2015 MEDICAL GLOVES FOR SINGLE USE – PART 2: REQUIREMENTS AND TESTING FOR PHYSICAL PROPERTIES |
| Test Result(s) | : PLEASE REFER TO THE FOLLOWING PAGE(S) |
| Conclusion | : THE SUBMITTED SAMPLE MET THE TEST REQUIREMENT. |

Remark: Unless otherwise stated the results shown in this test report refer only to the sample(s) tested.

SGS-CSTC Standards
Technical Services (Qingdao)
Co., Ltd.



Zhou Xinkuan, SK
Lab Manager

Unless otherwise agreed in writing, this document is issued by the Company subject to its General Conditions of Service printed overleaf, available on request or accessible at http://www.sgs.com/en/Terms-and-Conditions.aspx and, for electronic format documents, subject to Terms and Conditions for Electronic Documents at http://www.sgs.com/en/Terms-and-Conditions/Terms-e-Document.aspx. Attention is drawn to the limitation of liability, indemnification and jurisdiction issues defined therein. Any holder of this document is advised that information contained hereon reflects the Company's findings at the time of its intervention only and within the limits of Client's instructions, if any. The Company's sole responsibility is to its Client and this document does not exonerate parties to a transaction from exercising all their rights and obligations under the transaction documents. This document cannot be reproduced except in full, without prior written approval of the Company. Any unauthorized alteration, forgery or falsification of the content or appearance of this document is unlawful and offenders may be prosecuted to the fullest extent of the law.
Attention: To check the authenticity of testing /inspection report & certificate, please contact us at telephone: (86-755)8307 1443, or email: CN.Doccheck@sgs.com

SGS Center, No. 143, Zhuzhou Road, Laoshan District, Qingdao, China 266101          www.sgsgroup.com.cn



**Test Report**　　No.: QDHL1909015461OT　　Date: SEP.25,2019　　Page: 2 of 3

**Test Conducted:**

**EN 455-2-2015 Medical gloves for single use – part 2: Requirements and testing for physical properties**

| Number of test sample | : | 26 Pieces |
|---|---|---|
| The type of gloves | : | examination/procedure gloves c) |
| Manufacturing batch code | : | / |
| Size | : | Examination/procedure gloves: M |
| Defects observed before testing | : | No defects |

| Clause | Test Items | Result | Note |
|---|---|---|---|
| 5 | Strength | --- | --- |
| 5.2 | Force at break | Pass | # 1 |
| 5.3 | Force at break after challenge testing | Pass | # 1 |

Notes　：　#1　See result 1

**Test Result:**

**1. Strength**

Sample Quantity: 13pcs

| Size | M | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Force at break(N) | 7.8 | 8.5 | 8.0 | 9.0 | 9.4 | 8.9 | 6.8 | 7.1 | 8.2 | 8.9 | 8.3 | 8.6 | 8.4 |
| Force at break after challenge testing(N) | 7.8 | 7.6 | 8.3 | 7.6 | 6.5 | 6.1 | 8.4 | 7.4 | 6.8 | 6.8 | 8.5 | 7.2 | 6.0 |

Median value:
　　　Force at break during shelf life (N): 8.4
　　　Force at break after challenge testing (N): 7.4



Unless otherwise agreed in writing, this document is issued by the Company subject to its General Conditions of Service printed overleaf, available on request or accessible at http://www.sgs.com/en/Terms-and-Conditions.aspx and, for electronic format documents, subject to Terms and Conditions for Electronic Documents at http://www.sgs.com/en/Terms-and-Conditions/Terms-e-Document.aspx. Attention is drawn to the limitation of liability, indemnification and jurisdiction issues defined therein. Any holder of this document is advised that information contained hereon reflects the Company's findings at the time of its intervention only and within the limits of Client's instructions, if any. The Company's sole responsibility is to its Client and this document does not exonerate parties to a transaction from exercising all their rights and obligations under the transaction documents. This document cannot be reproduced except in full, without prior written approval of the Company. Any unauthorized alteration, forgery or falsification of the content or appearance of this document is unlawful and offenders may be prosecuted to the fullest extent of the law.
Attention: To check the authenticity of testing /inspection report & certificate, please contact us at telephone: (86-755)8307 1443, or email: CN.Doccheck@sgs.com

SGS Center, No. 143, Zhuzhou Road, Laoshan District, Qingdao, China 266101　　　　　www.sgsgroup.com.cn

## Test Report

No.: QDHL1909015461OT          Date: SEP.25,2019          Page: 3 of 3

Requirements: see table 3

### Table 3 — Median values of force at break

| | Force at break in Newton | | |
| --- | --- | --- | --- |
| | Surgical gloves a) | Examination/procedure gloves | |
| | | b) | c) |
| Throughout shelf life tested according to 5.2 and within 12 months of manufacture tested according to 5.3 | ≥ 9,0 | ≥ 6,0 | ≥ 3,6 |

a) Requirements for all surgical gloves.

b) Requirements for all examination gloves, except gloves made from thermoplastic materials (e.g. polyvinylchloride, polyethylene)..

c) Requirements for gloves made from thermoplastic materials (e.g. polyvinylchloride, polyethylene).

**Sample Photo:**

Received sample



SGS authenticate the photo on original report only

***End of Report***



Unless otherwise agreed in writing, this document is issued by the Company subject to its General Conditions of Service printed overleaf, available on request or accessible at http://www.sgs.com/en/Terms-and-Conditions.aspx and, for electronic format documents, subject to Terms and Conditions for Electronic Documents at http://www.sgs.com/en/Terms-and-Conditions/Terms-e-Document.aspx. Attention is drawn to the limitation of liability, indemnification and jurisdiction issues defined therein. Any holder of this document is advised that information contained hereon reflects the Company's findings at the time of its intervention only and within the limits of Client's instructions, if any. The Company's sole responsibility is to its Client and this document does not exonerate parties to a transaction from exercising all their rights and obligations under the transaction documents. This document cannot be reproduced except in full, without prior written approval of the Company. Any unauthorized alteration, forgery or falsification of the content or appearance of this document is unlawful and offenders may be prosecuted to the fullest extent of the law.
Attention: To check the authenticity of testing/inspection report & certificate, please contact us at telephone: (86-755)8307 1443, or email: CN.Doccheck@sgs.com

| SGS Center, No. 143, Zhuzhou Road, Laoshan District, Qingdao, China 266101          www.sgsgroup.com.cn

# INDICATIONS FOR USE

Applicant:    Shandong Yinghong Medical Products Co., Ltd.

510(k) Number:    *K110981*

Device Name:    Patient Nitrile Examination Gloves, Powder free, Non-Sterile, Blue Color

Indications of Use:

A patient examination glove is a disposable device intended for medical purposes that is worn upon the examiner's hands or finger to prevent contamination between patient and examiner (21 CFR 880.6250)

Prescription Use _____              Over the Counter Use ___X___

                                        Factory Initials              _____

(Division Sign-Off)
Division of Anesthesiology, General Hospital
Infection Control, Dental Devices

510(k) Number: *K110981*

# EXHIBIT 'C'

EXHIBIT 'C'





























# EXHIBIT 'D'

# Qualification

## MDD Product Qualification



| CE | EN 455 | FDA 510(K) | ASTM F1671 |

## Quality Control System



**TUV** EN ISO 13485    **SGS** EN ISO 13485    **TUV** EN ISO 9001    **SGS** EN ISO 9001

## Other Qualification



*Other Certifications or
Qualifications available.

日本食品衛生安全法検査合成績書
Japanese Food Safety Code 370    NSF Certificate    LFGB Certificate


INTCO
英 科 医 疗

# EXHIBIT 'E'

EXHIBIT 'E'

 Gmail

# Fwd: PPE AID Exam Grade

**Bur-Tex Hosiery** <brentburgess@farmerstel.com>
To: brentburgess case riznyk <brentburgess.case.riznyk@gmail.com>

Tue, Jul 26, 2022 at 12:19 PM

---

**From:** "Jack Safdeye" <jack@majestybrands.com>
**To:** "Brent Burgess" <brentburgess@farmerstel.com>
**Cc:** "david linker" <davidlinker1@mac.com>
**Sent:** Tuesday, January 19, 2021 1:51:01 PM
**Subject:** PPE AID Exam Grade

LANGUAGE ON THE PO IS :

PO IS CONDITIONAL ON SHIPPING PRIOR TO CHINESE NEW YEAR. WTT TO PROVIDE
PICTURES OF PRODUCT LOADING AND CONTAINER #'S TO SUBSTANTIATE PRODUCT
ARRIVAL. IF PRODUCT DOES NOT SHIP PRIOR TO CNY, ANY BALANCE CAN BE USED
FOR TOWARDS OTHER GLOVES WHICH INOV8 WILL PURCHASE UNDER PREVIOUS
PURCHASE ORDERS.

IN ADDITION THIS ORDER SHOULD HAVE NEW BOX FORMAT AS ENCLOSED. THE BOX
SHOULD ALSO BEAR THE MATCHING SUPPLIER INFORMATION FOUND ON THE 510K.

VENDOR CERTIFIES THAT THESE GLOVES ARE 100% NITRILE, 510K CERTIFIED AND
EXAM GRADE.

**Jack Safdeye** | CEO

 **Majesty BRANDS**

45 W 36





**4a0d8939-1ea0-4653-a871-bad4686f49e8HONGRAY PPE-AID NITRILE GLOVES 100 GLOVES LARGE SIZE COLORBOX v1.jpg**
983K

# EXHIBIT 'F'

EXHIBIT 'F'

# PPE AID NITRILE GLOVES

- 510K CERTIFIED
- FDA APPROVED
- EXAM GRADE
- POWDER FREE











1 of 8

# SGS

**Test Report**     No.: SHHL1602075368MD-01     Date: OCT. 06, 2020     Page: 1 of 8

SHIJIAZHUANG HONGRAY GROUP CO., LTD

SOUTH TONGDA RD., EAST DIST. JINZHOU CITY, HEBEI, 052260, CHINA

THE TEST REPORT IS TO SUPERSEDE THE TEST REPORT No.: SHHL1602075368MD
DATE: SEP. 28, 2020

The following sample(s) was/were submitted and identified by the client as:

| | |
|---|---|
| Sample Description | : DISPOSABLE NITRILE GLOVE |
| Style/ Item No. | : XS,S,M,L,XL,XXL |
| Country of Origin | : CHINA |
| Sample Receiving Date | : AUG. 29, 2020 |
| Testing Period | : AUG. 29, 2020 TO SEP. 28, 2020 |
| Test Performed | : SELECTED TEST(S) AS REQUESTED BY APPLICANT |
| Test Requested | : 1. EN 455-1:2000 MEDICAL GLOVES FOR SINGLE USE – |
| | PART 1: REQUIREMENTS AND TESTING FOR FREEDOM |
| | FROM HOLES |
| | 2. EN 455-2: 2000 MEDICAL GLOVES FOR SINGLE USE – |
| | PART 2: REQUIREMENTS AND TESTING FOR PHYSICAL |
| | PROPERTIE |
| | 3. EN 455-3: 2000 MEDICAL GLOVES FOR SINGLE USE— |
| | PART 3: REQUIREMENTS AND TESTING FOR BIOLOGICAL |
| | EVALUATION CLAUSE 4.4 & 4.6 |
| Test Result(s) | : FOR FURTHER DETAILS, PLEASE REFER TO THE |
| | FOLLOWING PAGE(S) |
| Conclusion | : THE SUBMITTED SAMPLE MET THE TEST REQUIREMENT. |

*************

Signed for and on behalf of
SGS-CSTC Standards Technical Services (Shanghai) Co., Ltd.

Vincent Feng
Technical Manager



Unless otherwise agreed in writing, this document is issued by the Company subject to its General Conditions of Service printed overleaf, available on request or accessible at http://www.sgs.com/en/Terms-and-Conditions.aspx and, for electronic format documents, subject to Terms and Conditions for Electronic Documents at http://www.sgs.com/en/Terms-and-Conditions/Terms-e-Document.aspx. Attention is drawn to the limitation of liability, indemnification and jurisdiction issues defined therein. Any holder of this document is advised that information contained hereon reflects the Company's findings at the time of its intervention only and within the limits of Client's instructions, if any. The Company's sole responsibility is to its Client and this document does not exonerate parties to a transaction from exercising all their rights and obligations under the transaction documents. This document cannot be reproduced except in full, without prior written approval of the Company. Any unauthorized alteration, forgery or falsification of the content or appearance of this document is unlawful and offenders may be prosecuted to the fullest extent of the law. Unless otherwise stated the results shown in this test report refer only to the sample(s) tested and such sample(s) are retained for 30 days only.
Attention: To check the authenticity of testing /inspection report & certificate, please contact us at telephone: (86-755) 8307 1443, or email: CN.Doccheck@sgs.com

3F, Building, No.889 Yishan Road, Xuhui District, Shanghai, China 200233     t (86) 400 690 9891     f (86-21) 6115 5555     www.sgsgroup.com.cn
中国·上海·徐汇区宜山路889号3号楼     邮编: 200233     t (86) 400 690 9891     f (86-21) 6115 5555     e sgs.china@sgs.com

Member of the SGS Group (SGS SA)



## Test Report    No.: SHHL1602075366MD-01    Date: OCT. 06, 2020    Page: 2 of 8

### Test Conducted:

**1.** EN 455-1:2000 Medical gloves for single use -- part 1: Requirements and testing for freedom from holes

| | |
|---|---|
| Number of test sample | : 200 Pieces |
| The type of gloves | : examination/procedure gloves |
| Manufacturing batch code | : / |
| Batch size | : / |
| Sample size | : XS, S, M, L, XL, XXL |
| Number of non-conforming gloves | : None |
| Defects observed before testing | : No defects |
| Test Result | : Pass |

| Clause | Test Items | Result | Note |
|---|---|---|---|
| 5 | Watertightness test for detection of holes | --- | --- |
| 5.1 | Referee testing | | # 1&2 |

**2.** EN 455-2:2000 Medical gloves for single use – part 2: Requirements and testing for physical propertie

| | |
|---|---|
| Number of test sample | : 104 Pieces |
| Type | : examination/procedure gloves |
| The manufacturing batch code | : / |
| Size | : XS, S, M, L, XL, XXL |
| Defects observed before testing | : No defects |
| Test Result | : Pass |

| Clause | Test Items | Result | Note |
|---|---|---|---|
| 4 | Dimensions | Pass | #3 |
| 5 | Strength | Pass | #1&4 |
| 7 | Labeling | Pass | / |



Unless otherwise agreed in writing, this document is issued by the Company subject to its General Conditions of Service printed overleaf, available on request or accessible at http://www.sgs.com/en/Terms-and-Conditions.aspx and, for electronic format documents, subject to Terms and Conditions for Electronic Documents at http://www.sgs.com/en/Terms-and-Conditions/Terms-e-Document.aspx. Attention is drawn to the limitation of liability, indemnification and jurisdiction issues defined therein. Any holder of this document is advised that information contained hereon reflects the Company's findings at the time of its intervention only and within the limits of Client's instructions, if any. The Company's sole responsibility is to its Client and this document does not exonerate parties to a transaction from exercising all their rights and obligations under the transaction documents. This document cannot be reproduced except in full, without prior written approval of the Company. Any unauthorized alteration, forgery or falsification of the content or appearance of this document is unlawful and offenders may be prosecuted to the fullest extent of the law. Unless otherwise stated the results shown in this test report refer only to the sample(s) tested and such sample(s) are retained for 30 days only.

Building, No.889, Yishan Road, Xuhui District Shanghai, China 200233    t (86) 400 000 9661    f (86-21) 6115 5899    www.sgsgroup.com.cn
中国·上海·徐汇区宜山路889号4号楼    邮编: 200233    t (86) 400 000 9661    f (86-21) 6115 5899    e sgs.china@sgs.com

Member of the SGS Group (SGS SA)



**Test Report**   No.: SHHL1602075366MD-01   Date: OCT. 06, 2020   Page: 3 of 8

3. EN 455-3: 2000 Medical gloves for single use—Part 3: Requirements and testing for biological evaluation

| | |
|---|---|
| Number of test sample | : 5 Pieces |
| Finishes of gloves | : Powdered-free gloves other than surgeon's gloves |
| Defects observed before testing | : No defects |
| Test Result | : Pass |

| Clause | Test Items | Result | Note |
|---|---|---|---|
| 4.4 | Powder | Pass | #1, 5&6 |
| 4.6 | Labeling | Pass | / |

Note:
1. As per client's declare, these gloves (four size: XS, S, M, L, XL, XXL) only size different, the material is the same, and only the glove of size M was tested.
2. See result 1.
3. See result 2.
4. See result 3.
5. Test according to EN ISO 21171-2006.
6. The powder of sample was 0.3mg<2mg.



Unless otherwise agreed in writing, this document is issued by the Company subject to its General Conditions of Service printed overleaf, available on request or accessible at http://www.sgs.com/en/Terms-and-Conditions.aspx and, for electronic format documents, subject to Terms and Conditions for Electronic Documents at http://www.sgs.com/en/Terms-and-Conditions/Terms-e-Document.aspx. Attention is drawn to the limitation of liability, indemnification and jurisdiction issues defined therein. Any holder of this document is advised that information contained hereon reflects the Company's findings at the time of its intervention only and within the limits of Client's instructions, if any. The Company's sole responsibility is to its Client and this document does not exonerate parties to a transaction from exercising all their rights and obligations under the transaction documents. This document cannot be reproduced except in full, without prior written approval of the Company. Any unauthorized alteration, forgery or falsification of the content or appearance of this document is unlawful and offenders may be prosecuted to the fullest extent of the law. Unless otherwise stated the results shown in this test report refer only to the sample(s) tested and such sample(s) are retained for 30 days only.

3rd Building No.889, Yishan Road, Xuhui District Shanghai, China 200233   t (86) 400 000 9661   f (86-21) 6115 0899   www.sgsgroup.com.cn
中国·上海·徐汇区宜山路889号3号楼   邮编: 200233   t (86) 400 000 9661   f (86-21) 6115 0899   e sgs.china@sgs.com

Member of the SGS Group (SGS SA)



**Test Report**   No.: SHHL1602075366MD-01   Date: OCT. 06, 2020   Page: 4 of 8

**Test Results:**

### 1. Watertightness test for detection of holes

Sample Quantity: 200pcs

AQL:   1.5   Accept: 7   Reject: 8   Found:   0

### 2. Dimensions

Sample Quantity: 78pcs

| Size | XS | | | | | | | | | | | |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Length(mm) | 253 | 253 | 253 | 254 | 252 | 255 | 256 | 254 | 253 | 254 | 252 | 253 | 253 |
| Width(mm) | 79 | 78 | 79 | 77 | 78 | 77 | 78 | 77 | 78 | 79 | 78 | 79 | 78 |

Median value:
Length (mm): 253
Width (mm): 78

| Size | S | | | | | | | | | | | |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Length(mm) | 245 | 244 | 242 | 243 | 244 | 246 | 245 | 244 | 245 | 246 | 244 | 243 | 243 |
| Width(mm) | 88 | 85 | 87 | 86 | 88 | 87 | 86 | 88 | 87 | 88 | 87 | 86 | 85 |

Median value:
Length (mm): 244
Width (mm): 87

| Size | M | | | | | | | | | | | |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Length(mm) | 244 | 245 | 245 | 246 | 245 | 247 | 246 | 245 | 244 | 245 | 246 | 247 | 246 |
| Width(mm) | 96 | 95 | 97 | 96 | 95 | 97 | 96 | 96 | 95 | 96 | 97 | 96 | 97 |

Median value:
Length (mm): 245
Width (mm): 96

| Size | L | | | | | | | | | | | |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Length(mm) | 243 | 242 | 241 | 242 | 243 | 242 | 242 | 242 | 242 | 243 | 241 | 242 | 243 |
| Width(mm) | 109 | 108 | 107 | 109 | 108 | 107 | 108 | 107 | 108 | 109 | 108 | 107 | 107 |

Median value:
Length (mm): 242
Width (mm): 108



Unless otherwise agreed in writing, this document is issued by the Company subject to its General Conditions of Service printed overleaf, available on request or accessible at http://www.sgs.com/en/Terms-and-Conditions.aspx and, for electronic format documents, subject to Terms and Conditions for Electronic Documents at http://www.sgs.com/en/Terms-and-Conditions/Terms-e-Document.aspx. Attention is drawn to the limitation of liability, indemnification and jurisdiction issues defined therein. Any holder of this document is advised that information contained hereon reflects the Company's findings at the time of its intervention only and within the limits of Client's instructions, if any. The Company's sole responsibility is to its Client and this document does not exonerate parties to a transaction from exercising all their rights and obligations under the transaction documents. This document cannot be reproduced except in full, without prior written approval of the Company. Any unauthorized alteration, forgery or falsification of the content or appearance of this document is unlawful and offenders may be prosecuted to the fullest extent of the law. Unless otherwise stated the results shown in this test report refer only to the sample(s) tested and such sample(s) are retained for 30 days only.

中国·上海·徐汇宜山路889号4号楼   邮编 200233   t (86) 400 060 9001   f (86-21) 6115 5888   www.sgsgroup.com.cn   t sgs.china@sgs.com



**Test Report**     No.: SHHL1602075366MD-01     Date: OCT. 06, 2020     Page: 5 of 8

| Size | XL | | | | | | | | | | | | |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Length(mm) | 249 | 248 | 250 | 249 | 247 | 248 | 249 | 248 | 248 | 249 | 248 | 249 | 248 |
| Width(mm) | 114 | 113 | 114 | 115 | 113 | 114 | 115 | 115 | 114 | 115 | 116 | 114 | 115 |

Median value:
    Length (mm): 248
    Width (mm): 114

| Size | XXL | | | | | | | | | | | | |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Length(mm) | 245 | 246 | 244 | 244 | 245 | 246 | 245 | 246 | 246 | 245 | 245 | 244 | 243 |
| Width(mm) | 119 | 118 | 120 | 119 | 118 | 119 | 118 | 120 | 119 | 118 | 119 | 120 | 119 |

Median value:
    Length (mm): 245
    Width (mm): 119

Requirements: see table 1&2

### Table 1 Dimensions for surgical gloves

| Size | Median length in mm | Median width in mm |
|------|---------------------|--------------------|
| 5 | ≥250 | 67 ± 4 |
| 5.5 | ≥250 | 72 ± 4 |
| 6 | ≥260 | 77 ± 5 |
| 6.5 | ≥260 | 83 ± 5 |
| 7 | ≥270 | 89 ± 5 |
| 7.5 | ≥270 | 95 ± 5 |
| 8 | ≥270 | 102 ± 6 |
| 8.5 | ≥280 | 108 ± 6 |
| 9 | ≥280 | 114 ± 6 |
| 9.5 | ≥280 | 121 ± 6 |

### Table 2 Dimensions for examination/procedure gloves

| Size | Median length in mm | Median width in mm |
|------|---------------------|--------------------|
| Extra small | ≥240 | ≤80 |
| Small | | 80 ± 10 |
| Medium | | 95 ± 10 |
| Large | | 110 ± 10 |
| Extra Large | | ≥110 |



Unless otherwise agreed in writing, this document is issued by the Company subject to its General Conditions of Service printed overleaf, available on request or accessible at http://www.sgs.com/en/Terms-and-Conditions.aspx and, for electronic format documents, subject to Terms and Conditions for Electronic Documents at http://www.sgs.com/en/Terms-and-Conditions/Terms-e-Document.aspx. Attention is drawn to the limitation of liability, indemnification and jurisdiction issues defined therein. Any holder of this document is advised that information contained hereon reflects the Company's findings at the time of its intervention only and within the limits of Client's instructions, if any. The Company's sole responsibility is to its Client and this document does not exonerate parties to a transaction from exercising all their rights and obligations under the transaction documents. This document cannot be reproduced except in full, without prior written approval of the Company. Any unauthorized alteration, forgery or falsification of the content or appearance of this document is unlawful and offenders may be prosecuted to the fullest extent of the law. Unless otherwise stated the results shown in this test report refer only to the sample(s) tested and such sample(s) are retained for 30 days only.
Attention: To check the authenticity of testing /inspection report & certificate, please contact us at telephone: (86-755)8307 1443, or email: CN.Doccheck@sgs.com

3rd Building, No.889, Yishan Road, Xuhui District, Shanghai, China 200233     t (86-21) 6115 5888 / (86-21) 6115 5888     www.sgsgroup.com.cn
中国·上海·徐汇宜山路889号3号楼     邮编: 200233     t (86-21) 6115 5888 / (86-21) 6115 5888     e sgs.china@sgs.com

Member of the SGS Group (SGS SA)



**Test Report**    No.: SHHL1602075366MD-01    Date: OCT. 06, 2020    Page: 6 of 8

### 3. Strength

Sample Quantity: 26pcs

| Size | M | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Force at break(N) | 9.19 | 8.79 | 9.27 | 9.02 | 8.25 | 9.35 | 9.27 | 9.36 | 8.98 | 8.38 | 9.02 | 8.90 | 9.58 |
| Force at break after challenge testing(N) | 9.41 | 9.50 | 9.50 | 9.38 | 9.58 | 9.46 | 9.23 | 9.38 | 9.77 | 9.50 | 9.58 | 9.18 | 9.65 |

Median value:
Force at break during shelf life (N): 9.02
Force at break after challenge testing (N): 9.50

Table 3 — Median values of force at break

| | Force at break in Newton | | |
|---|---|---|---|
| | Surgical gloves a) | Examination/procedure gloves | |
| | | b) | c) |
| Throughout shelf life tested according to 5.2 and within 12 months of manufacture tested according to 5.3 | ≥ 9.0 | ≥ 6.0 | ≥ 3.6 |

a) Requirements for all surgical gloves.

b) Requirements for all examination gloves, except gloves made from thermoplastic materials (e.g. polyvinylchloride, polyethylene).

c) Requirements for gloves made from thermoplastic materials (e.g. polyvinylchloride, polyethylene).

Remark:
1. The sample selecting amount for Watertightness test for detection of holes is deviated to 200 pcs as accessed by SGS.



Unless otherwise agreed in writing, this document is issued by the Company subject to its General Conditions of Service printed overleaf, available on request or accessible at http://www.sgs.com/en/Terms-and-Conditions.aspx and, for electronic format documents, subject to Terms and Conditions for Electronic Documents at http://www.sgs.com/en/Terms-and-Conditions/Terms-e-Document.aspx. Attention is drawn to the limitation of liability, indemnification and jurisdiction issues defined therein. Any holder of this document is advised that information contained hereon reflects the Company's findings at the time of its intervention only and within the limits of Client's instructions, if any. The Company's sole responsibility is to its Client and this document does not exonerate parties to a transaction from exercising all their rights and obligations under the transaction documents. This document cannot be reproduced except in full, without prior written approval of the Company. Any unauthorized alteration, forgery or falsification of the content or appearance of this document is unlawful and offenders may be prosecuted to the fullest extent of the law. Unless otherwise stated the results shown in this test report refer only to the sample(s) tested and such sample(s) are retained for 30 days only.
Attention: To check the authenticity of testing /inspection report & certificate, please contact us at telephone: (86-755)8307 1443, or email: CN.Doccheck@sgs.com

No.3 Building, No.889, Yishan Road, Xuhui District, Shanghai, China 200233    t (86-21)6115 5888    f (86-21)6115 5888    www.sgsgroup.com.cn
中国·上海·徐汇区宜山路889号3号楼    邮编: 200233    t (86-21)6115 5888    f (86-21)6115 5888    e sgs.china@sgs.com

Member of the SGS Group (SGS SA)

# SGS

**Test Report**     No.: SHHL1602075366MO-01     Date: OCT. 06, 2020     Page: 7 of 8

**Sample Photo:**

Received sample (size XS)



Received sample (size S)



Received sample (size M)



Received sample (size L)





Unless otherwise agreed in writing, this document is issued by the Company subject to its General Conditions of Service printed overleaf, available on request or accessible at http://www.sgs.com/en/Terms-and-Conditions.aspx and, for electronic format documents, subject to Terms and Conditions for Electronic Documents at http://www.sgs.com/en/Terms-and-Conditions/Terms-e-Document.aspx. Attention is drawn to the limitation of liability, indemnification and jurisdiction issues defined therein. Any holder of this document is advised that information contained hereon reflects the Company's findings at the time of its intervention only and within the limits of Client's instructions, if any. The Company's sole responsibility is to its Client and this document does not exonerate parties to a transaction from exercising all their rights and obligations under the transaction documents. This document cannot be reproduced except in full, without prior written approval of the Company. Any unauthorized alteration, forgery or falsification of the content or appearance of this document is unlawful and offenders may be prosecuted to the fullest extent of the law. Unless otherwise stated the results shown in this test report refer only to the sample(s) tested and such sample(s) are retained for 30 days only.

Building, No.889, Yishan Road, Xuhui District Shanghai China 200233     t (86) 400 900 9661     f (86-21) 6115 5858     www.sgsgroup.com.cn
中国·上海·徐汇区宜山路889号     邮编: 200233     t (86) 400 900 9661     f (86-21) 6115 5858     e sgs.china@sgs.com

Member of the SGS Group (SGS SA)



## Test Report    No.: SHHL1602075366MD-01    Date: OCT. 06, 2020    Page: 8 of 8

Received sample (size XL)



Received sample (size XXL)



SGS authenticate the photo on original report only

***End of Report***



Unless otherwise agreed in writing, this document is issued by the Company subject to its General Conditions of Service printed overleaf, available on request or accessible at http://www.sgs.com/en/Terms-and-Conditions.aspx and, for electronic format documents, subject to Terms and Conditions for Electronic Documents at http://www.sgs.com/en/Terms-and-Conditions/Terms-e-Document.aspx. Attention is drawn to the limitation of liability, indemnification and jurisdiction issues defined therein. Any holder of this document is advised that information contained hereon reflects the Company's findings at the time of its intervention only and within the limits of Client's instructions, if any. The Company's sole responsibility is to its Client and this document does not exonerate parties to a transaction from exercising all their rights and obligations under the transaction documents. This document cannot be reproduced except in full, without prior written approval of the Company. Any unauthorized alteration, forgery or falsification of the content or appearance of this document is unlawful and offenders may be prosecuted to the fullest extent of the law. Unless otherwise stated the results shown in this test report refer only to the sample(s) tested and such sample(s) are retained for 30 days only.
Attention: To check the authenticity of testing / inspection report & certificate, please contact us at telephone: (86-755)8307 1443, or email: CN.Doccheck@sgs.com

Building No.889, Yishan Road, Xuhui District Shanghai, China 200233     t (86) 400 900 9661     f (86-21)6115 5899     www.sgsgroup.com.cn
中国・上海・徐汇区宜山路889号889号楼    邮编: 200233      t (86) 400 900 9661     f (86-21)6115 5899     e sgs.china@sgs.com

Member of the SGS Group (SGS SA)


U.S. FOOD & DRUG
ADMINISTRATION

November 30, 2018

Be...
...y Lia
...st M...

...cal Products Inc
3971 Schaefer Avenue. Chino, CA 91810, USA

Re: K182600
Trade/Device Name: Powder Free Nitrile Examination Glove, Tested for Use with Chemotherapy Drugs (Blue)
Regulation Number: 21 CFR 880.6250
Regulation Name: Non-Powdered Patient Examination Glove
Regulatory Class: Class I
Product Code: LZA, LZC
Dated: September 16, 2018
Received: September 21, 2018

...Lia

We have rev... ...market notification of intent to market the device referenced above and have determin... ...t Use the indications for use stated (... enclosure) to legally marketed predicate devic... ...enactment date of the Medical Device Amendments, or to devices that... ...in accordance with the provisions of the Federal Food, Drug, and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA). You may, therefore, market the device, subject to the general controls provisions of the Act. Although this letter refers to your product as a device, please be aware that some cleared products may instead be combination products. The 510(k) Premarket Notification Database located at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm identifies combination product submissions. The general controls provisions of the Act include requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration. Please note: CDRH does not evaluate information related to contract liability warranties. We remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it may be subject to additional controls. Existing major regulations affecting your device can be found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

statutes and regulations administered by other Federal agencies. You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803) for devices or postmarketing safety reporting (21 CFR 4, Subpart B) for combination products (see https://www.fda.gov/CombinationProducts/GuidanceRegulatoryInformation/ucm597488.htm); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820) for devices or current good manufacturing practices (21 CFR 4, Subpart A) for combination products; and, if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act); 21 CFR 1000-1050.

Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part 807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part 803), please go to http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm.

For comprehensive regulatory information about medical devices and radiation-emitting products, including information about labeling regulations, please see Device Advice (https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/) and CDRH Learn (http://www.fda.gov/Training/CDRHLearn). Additionally, you may contact the Division of Industry and Consumer Education (DICE) to ask a question about a specific regulatory topic. See the DICE website (http://www.fda.gov/DICE) for more information or contact DICE by email (DICE@fda.hhs.gov) or phone (1-800-638-2041 or 301-796-7100).

# EXHIBIT 'G'

EXHIBIT 'G'

Item 7



## APPLIED TECHNICAL SERVICES

1049 Triad Court, Marietta, GA 30062 • (770) 423-1400 Fax (770) 424-6415

# CHEMICAL TEST REPORT

| **Ref.** 356116 | **Date** May 27, 2021 | **Page** 1 | **of** 3 |
|---|---|---|---|

Attention: Colton Childress

Customer: Bur-Tex Hosiery
521 Paul Benefield Lane
P. O. Box 487
Fyffe, AL 35971

P.O.#    CC

Part No.    See Below

Materials Specification: N/A

Test Method: FT-IR (ASTM E1252-98(2013)e1)

Lab Comment: Tested in accordance with ATS QA Manual, Rev. 18, dated 10/16/2020.

## Test Results

| Part Identification | Quantity | Results |
|---|---|---|
| Glove Sample (see Fig. 1)

Durable Nitrile

PPE-Aid
(Two different colored gloves are in the bag. ATS was requested to test the dark glove only) | 1 lot

1 lot | ATS was requested to confirm that the gloves are made of nitrile rubber by FT-IR.

Both glove samples were analyzed by FT-IR. The resulting IR spectra are presented in Fig. 2 and Fig. 3.

Conclusion: Both the durable nitrile glove and the dark PPE-Aid glove are made of phthalate plasticized PVC. They are not nitrile gloves. |

**ISO 9001**

Prepared by:

Digitally signed by Sue Zhang
Date: 2021.05.27 13:00:58 -04'00'

S. Zhang, PhD
Senior Chemist

Approved by:

Justin Burmeister
Digitally signed by Justin Burmeister
Date: 2021.05.27 13:58:40 -04'00'

J. Burmeister
Manager

This report may not be reproduced except in full without the written approval of ATS. This report represents interpretation of the results obtained from the test specimen and is not to be construed as a guarantee or warranty of the condition of the entire material lot. If the method used is a customer provided, non-standard test method, ATS does not assume responsibility for validation of the method. Measurement uncertainty available upon request where applicable.

 **APPLIED TECHNICAL SERVICES**

1049 Triad Court, Marietta, GA 30062 • (770) 423-1400 Fax (770) 424-6415

# CHEMICAL TEST REPORT

| **Ref.** 356116 | **Date** May 27, 2021 | **Page** 2 | **of** 3 |





Fig. 1: Photos of gloves samples received

# ATS    APPLIED TECHNICAL SERVICES

1049 Triad Court, Marietta, GA 30062 • (770) 423-1400 Fax (770) 424-6415

## CHEMICAL TEST REPORT

| Ref. 356116 | Date May 27, 2021 | Page 3 | of 3 |



Fig. 2: Comparison of IR spectrum of durable nitrile glove with IR spectra of known substances



Fig. 3: Comparison of IR spectrum of PPE-Aid dark glove with IR spectra of known substances

# EXHIBIT 'H'

EXHIBIT 'H'

# SETTLEMENT AGREEMENT AND RELEASE

*3/4/21  JS*

This Confidential Settlement Agreement and Release (this "**Agreement**") is entered into as of [DATE] by and between (a) Inov8 Marketing LLC a New York limited liability company, having its principal place of business at 45 West 36ᵗʰ Street, New York, New York 10018 ("**Inov8**") and (Burtex Hosiery, Inc., an Alabama Corporation, having its principal place of business at 521 Paul Benofield Lane, Fyffe, Alabama 35971 ("**Burtex**", and together with Inov8, the "**Parties**", and each, a "**Party**")

## BACKGROUND

WHEREAS, Burtex has purchased and has committed to continue to purchase certain products (the "**Products**") from Inov8 (the "**Agreement**").

WHEREAS, Burtex wishes to be relieved of its obligation to purchase any additional Products of any kind from Inov8 for which Burtex has placed orders.

WHEREAS, Inov8 relied on Burtex's commitment to purchase additional Products and in connection with such commitment, deposited funds with the manufacturers of the Products; and

WHEREAS, the Parties wish execute mutual releases on the terms and conditions set out herein

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged  and intending to be legally bound hereby, the Parties hereby agree as follows

## AGREED TERMS

1   <u>Termination of Burtex's Obligations</u>  Burtex shall not be required to make any additional payment towards the purchase of Products and shall not be required to take delivery on Product ordered from Inov8

2   <u>Deposits Paid by Burtex</u>  Burtex acknowledges that Inov8 purchases Products from a third party and that to secure orders for Products from such third parties, Inov8 was and is required to deposit funds towards the purchase of the Products  Burtex acknowledges that any amounts deposited with Inov8 for future orders of Products were transferred to third parties to secure Inov8's purchase of the Products to supply to Burtex  In an effort to retrieve the deposits paid by Burtex and Inov8 for Products not yet taken by Burtex, the third parties are working to liquidate such Products, Inov8 will return the deposits towards such Products to Burtex when such third parties return the deposit to Inov8. The for the purposes of clarity, the total amount deposited by Inov8 with such third parties is $1,665,725.00

3   <u>Mutual Release</u>  The Parties, on behalf of themselves, their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates, and assigns, and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them, hereby release and discharge the other Party, together with their predecessors, successors, direct and indirect parent companies  direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates and assigns and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them, from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, wages, medical costs, pain and suffering, mental anguish, emotional distress, expenses (including attorneys' fees and costs actually incurred), and punitive damages, of any nature whatsoever, known or unknown, which either Party has, or may have had, against the other Party, whether or not apparent or yet to be discovered, or which may hereafter develop  for any acts or omissions related to or arising from

(a) the order, purchase, and sale of the Products at time, whether or not such Products were delivered, including without limitation the quality of the Products and the deposits referenced in Section 2 (the "**Dispute**").

*3-4-21*

*BB*

*3-4-21*
*JS*

(b) an agreement between the Parties,

(c) any other matter between the Parties, and/or

(d) any claims under federal, state, or local law, rule, or regulation.

This Agreement resolves any claim for relief that is, or could have been, alleged, no matter how characterized, including, without limitation, compensatory damages, damages for breach of contract, bad faith damages, reliance damages, liquidated damages, damages for humiliation and embarrassment, punitive damages, costs, and attorneys' fees related to or arising from the Dispute.

4. No Outstanding or Known Future Claims/Causes of Action. Each Party affirms that it has not filed with any governmental agency or court any type of action or report against the other Party, and currently knows of no existing act or omission by the other Party that may constitute a claim or liability excluded from the release in Section 3 above.

5. Acknowledgement of Settlement. The Parties, as broadly described in Section 3 above, acknowledge that (a) the consideration set forth in this Agreement, which includes, but is not limited to, is in full settlement of all claims or losses of whatsoever kind or character that they have, or may ever have had, against the other Party, as broadly described in Section 3 above, including by reason of the Dispute and (b) by signing this Agreement, and accepting the consideration provided herein and the benefits of it, they are giving up forever any right to seek further monetary or other relief from the other Party, as broadly described in Section 3 above, for any acts or omissions up to and including the Effective Date, as set forth in Section 15, including, without limitation, the Dispute.

6. No Admission of Liability. The Parties acknowledge that the Settlement Payment was agreed upon as a compromise and final settlement of disputed claims and that payment of the Settlement Payment is not and may not be construed as, an admission of liability by Inov8 and is not to be construed as an admission that Inov8 engaged in any wrongful, tortious, or unlawful activity. Inov8 specifically disclaims and denies (a) any liability to Burtev and (b) engaging in any wrongful, tortious, or unlawful activity.

7. Agreement is Legally Binding. The Parties intend this Agreement to be legally binding upon and shall inure to the benefit of each of them and their respective successors, assigns, executors, administrators, heirs, and estates. Moreover, the persons and entities referred to in Section 3 above, but not a Party, are third-party beneficiaries of this Agreement.

8. Entire Agreement. The recitals set forth at the beginning of this Agreement are incorporated by reference and made a part of this Agreement. This Agreement constitutes the entire agreement and understanding of the Parties and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof. Furthermore, no modification of this Agreement shall be binding unless in writing and signed by each of the parties hereto.

9. New or Different Facts, No Effect. Except as provided herein, this Agreement shall be, and remain, in effect despite any alleged breach of this Agreement or the discovery or existence of any new or additional fact, or any fact different from that which either Party now knows or believes to be true. Notwithstanding the foregoing, nothing in this Agreement shall be construed as, or constitute, a release of any Party's rights to enforce the terms of this Agreement.

10. Interpretation. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

11. Choice of Law. This Agreement and all related documents, and all matters arising out of or relating to the making or performance of this Agreement, whether sounding in contract, tort, or statute, are governed by, construed in accordance with and enforced under the laws of the State of New York, United States of America (including its statutes of limitations), without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of New York. Any legal suit, action or proceeding arising out of or relating to this Agreement must be instituted in the federal courts of the

3-4-21

BB

3-4-21    JS-

United States of America or the courts of the State of New York, in each case located in the City of New
York and County of New York, and each Party irrevocably submits to the exclusive jurisdiction of such
courts in any such suit, action, or proceeding. All parties to this Agreement consent to personal
jurisdiction in such courts as well as service of process by notice sent by overnight delivery to the
addresses above or by any means authorized by New York State law.

12. Reliance on Own Counsel. In entering into this Agreement, the Parties acknowledge that they
have relied upon the legal advice of their respective attorneys who are the attorneys of their own
choosing, that such terms are fully understood and voluntarily accepted by them, and that, other than the
consideration set forth herein, no promises or representations of any kind have been made to them by the
other Party. The Parties represent and acknowledge that in executing this Agreement they did not rely,
and have not relied, upon any representation or statement, whether oral or written, made by the other
Party or by that other Party's agents, representatives, or attorneys with regard to the subject matter, basis,
or effect of this Agreement or otherwise.

13. Counterparts. This Agreement may be executed by the Parties in counterparts, each of which
shall be deemed an original, but all of which together shall constitute one and the same instrument.
Delivery of an executed counterpart of this Agreement electronically shall be effective as delivery of an
original executed counterpart of this Agreement.

14. Authority to Execute Agreement. By signing below, each Party warrants and represents that
the person signing this Agreement on its behalf has authority to bind that Party and that the Party's
execution of this Agreement is not in violation of any by-law, covenants, and/or other restrictions placed
upon them by their respective entities.

15. Effective Date. The terms of the Agreement will be effective on the date set forth above (the
"Effective Date").

**READ THE FOREGOING DOCUMENT CAREFULLY. IT INCLUDES A
RELEASE OF KNOWN AND UNKNOWN CLAIMS.**

IN WITNESS WHEREOF, and intending to be legally bound, each of the Parties hereto has caused
this Agreement to be executed as of the date(s) set forth below.

for Inv08 Marketing LLC
Name: Joel Schron
Title: CEO                          3-4-21   JS

for Burtex Hosiery, Inc
Name: Bob Brown
Title: CEO                          3-4-21

6

# EXHIBIT 'I'



November 30, 2018

Better Care Plastic Technology Co., Ltd
℅ Kathy Liu
Project Manager
Hongray USA Medical Products Inc
3973 Schaefer Avenue, Chino, CA 91810, USA

Re: K182600
    Trade/Device Name:  Powder Free Nitrile Examination Glove, Tested for Use with Chemotherapy
                   Drugs (Blue)
    Regulation Number: 21 CFR 880.6250
    Regulation Name:  Non-Powdered Patient Examination Glove
    Regulatory Class:  Class I
    Product Code:  LZA, LZC
    Dated:  September 16, 2018
    Received:  September 21, 2018

Dear Kathy Liu:

We have reviewed your Section 510(k) premarket notification of intent to market the device referenced
above and have determined the device is substantially equivalent (for the indications for use stated in the
enclosure) to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976, the
enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance
with the provisions of the Federal Food, Drug, and Cosmetic Act (Act) that do not require approval of a
premarket approval application (PMA). You may, therefore, market the device, subject to the general
controls provisions of the Act. Although this letter refers to your product as a device, please be aware that
some cleared products may instead be combination products. The 510(k) Premarket Notification Database
located at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm identifies combination
product submissions. The general controls provisions of the Act include requirements for annual registration,
listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and
adulteration. Please note:  CDRH does not evaluate information related to contract liability warranties. We
remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it may be
subject to additional controls. Existing major regulations affecting your device can be found in the Code of
Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may publish further announcements
concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA
has made a determination that your device complies with other requirements of the Act or any Federal

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov